UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
———

MICHAEL D. CAMPBELL,

                Petitioner,                      Case No. 1:10-cv-417

v.                                        Honorable Gordon J. Quist

CARMEN PALMER,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial in the Wayne County Circuit Court, Petitioner was convicted of second-degree criminal sexual conduct involving a weapon (CSC II), MICH. COMP. LAWS § 750.520c(1)(e), third-degree criminal sexual conduct involving force or coercion (CSC III), MICH. COMP. LAWS § 750.520d(1)(b), kidnaping, MICH. COMP. LAWS § 750.349, assault with intent to commit great bodily harm less than murder (assault with intent), MICH. COMP. LAWS § 750.84, and assault and battery, MICH. COMP. LAWS § 750.81. On August 15, 2007, Petitioner was sentenced to three prison terms of 10 to 15 years for the CSC II, CSC III and kidnaping convictions and a term of 6 to 10 years for the assault-with-intent conviction. In his *pro se* petition, Petitioner raises two grounds for relief, as follows:

    I.      WAS [PETITIONER] DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL ATTORNEY FAILED TO OBTAIN RECORDS REGARDING THE COMPLAINANT'S MENTAL HEALTH AND SECURE A PSYCHOLOGICAL EXPERT WITNESS TO IMPEACH THE TESTIMONY OF THE MENTALLY-ILL COMPLAINANT?

II. WAS [PETITIONER] DENIED A FAIR TRIAL WHEN THE PROSECUTOR REPEATEDLY REFERRED TO EVIDENCE OUTSIDE OF THE RECORD TO BOLSTER THE COMPLAINANT, AND IMPROPERLY APPEALED TO THE JURY TO SYMPATHIZE WITH THE COMPLAINANT?

Respondent has filed an answer to the petition (docket #7) stating that the grounds should be denied because they are procedurally defaulted or without merit. Upon review and applying the AEDPA standards, I recommend that the petition be denied.

## Procedural History

### A. Trial Court Proceedings

The state prosecution arose from events that occurred on October 26, 2006, during which a 26-year-old schizophrenic man was taken into a motel room and anally penetrated. Petitioner was charged with ten counts: two counts of CSC I; one count of CSC II; one count of kidnapping; one count of assault with intent; one count of delivery of a controlled substance; three counts of assault with a dangerous weapon; and one count of assault and battery. Following a preliminary examination on November 28, 2006, Petitioner was bound over on all charges. (Prelim. Exam. Tr. at 88, docket #10.) Two weeks later, the court issued an order for a competency evaluation. At a hearing held February 12, 2007, upon stipulation of the parties, the court found Petitioner competent to stand trial. (Comp. Hr'g Tr. at 4, docket #11.)

An eleventh count, CSC III, was subsequently added to the information. Defense counsel filed a motion to quash the information and a motion to suppress Petitioner's statements.

At a hearing held April 11, 2007, both motions were denied. (Mot. Hr'g Tr. at 8, 43, docket #13.) Petitioner was tried before a jury beginning July 25, 2007, and concluding July 30, 2007.[1]

Ryan Keller testified that he was 24 years old and diagnosed with schizophrenia and cognitive impairment and lived in a group home. (Tr. I at 79-80.) On March 26, 2006, he was with his "girlfriend" Holly, whom he had known for a couple of days. (*Id.* at 80-81.) He had walked away from the group home at which he resided and had ended up on Michigan Avenue in Dearborn, where he was sleeping on a bench. (*Id.* at 81.) He met Holly and began staying with her at the Falcon Inn Motel two or three days before the incident in issue. (*Id.*) Holly went to work at the Silver Cricket. Because the room was not prepaid for the next day, Keller was sitting on the ground outside the room. A man Keller believed to have been a janitor approached Keller and asked him if he wanted to smoke some weed with him. (*Id.*) Plaintiff intended to do so, but he did not know which room to go to. He began to knock on doors randomly. When he knocked at Room 24, he knocked on the "wrong door," because Petitioner punched him in the face and pulled him into the room, kidnaping him and ultimately raping and stabbing him. (*Id.* at 82-83, 117.) Petitioner first offered Keller beer and drugs. Keller did not know what he was smoking, but he subsequently learned that it was a combination of crack cocaine and marijuana. (*Id.* at 82.) Petitioner then told Keller to strip out of his nice clothes and put on some "bummy" clothes that Petitioner took from his closet. (*Id.* at 83, 87.) Petitioner told Keller to empty his pockets, which Keller did. (*Id.* at 88.) Keller testified that Petitioner put his "dick" inside Keller's "ass" multiple times. (*Id.* at 83-84.)

---

[1]References to the trial transcripts will be hereafter designated as follows:
July 25, 2007 (docket #18): Tr. I at ___.
July 26, 2007 (docket #19): Tr. II at ___.
July 27, 2007 (docket #20): Tr. III at ___.
July 30, 2007 (docket #17): Tr. IV at ___.

Petitioner testified that he had never been in such a situation before and did not want to have sex with Petitioner. (*Id.*) Keller identified multiple pictures of the room and the bed over which Petitioner had him bend. (*Id.* at 86-89.) Keller did not want to bend over and told Petitioner, "No." (*Id.* at 87.) Keller also identified pictures showing his own blood on blankets and the carpet leading to where he sat down in a corner. (*Id.* at 89-90.) According to Keller, Petitioner threw a knife at Keller, hitting his leg. Keller pulled the knife out, and Petitioner told him to go to the bathroom and wash it. Keller "washed it out in the bathtub and there was blood everywhere." (*Id.* at 91.) Keller identified a picture showing the bloody bathtub and towels. (*Id.* at 96.) Two other men were in the room at the time. Keller was unable to describe them, but he recognized a white man he saw at the courthouse that day as one of the men who was present when he was stabbed. (*Id.* at 92.) A black man also was present and tried to calm Petitioner down. (*Id.* at 93.) Keller stated that he was sitting in the corner because he was scared. (*Id.* at 94.) While Keller was sitting in the corner, Petitioner shoved a cigarette up his nose. (*Id.* at 104.) Keller identified a picture of a bottle of lotion that Petitioner had used to rape him. Petitioner also asked Keller to use the lotion to massage Petitioner's groin. (*Id.* at 94-95.)

According to Keller, sometime after he had been raped, he accompanied Petitioner to Burger King, where they met two white men and a man he now knows is a police officer, Corporal Christensen. Keller and Petitioner went to get food. As they were walking back to the table, Keller asked Petitioner if he wanted ketchup. Petitioner punched Keller in the chest. (*Id.* at 100-01.) Keller testified that he accompanied Petitioner because he was afraid of him and because Petitioner had told him that he had a gun and Keller could not leave. (*Id.* at 101-02.) Keller testified that he saw a man he knew from his group home while at the Burger King, but he did not ask for

- 4 -

help because he had never asked anyone for help.  (*Id.* at 130.)  He also was afraid of Petitioner and believed Petitioner would find him if he got away.  (*Id.* at 131.)  Keller ultimately delivered drugs to Petitioner.  He did not know at the time what he was delivering, and he believed that he had no choice but to do as he was told.  (*Id.* at 103.)  At about 7:00 p.m., Holly raced up the stairs to the room and Keller began limping down the stairs, finding police surrounding the building.  (*Id.* at 125.)

Keller testified that he could no longer remember anything about the second time he was raped, because his memory was not good.  (*Id.* at 108-09.)  He acknowledged on cross-examination that he had not had his medicine since he left the group home, several days before the incident.  (*Id.* at 113-14.)  He also acknowledged that he had been smoking marijuana during those days.  (*Id.* at 115.)  Keller testified that, when he does not take his medicine, he is unable to sleep for days at a time, and he has auditory hallucinations.  He does not, however, have visual hallucinations.  (*Id.* at 128.)

Keith Mitchell testified that he drove his friend "Loco" to the Falcon Inn on October 26, 2006, so that Loco could visit a friend.  (*Id.* at 133-34.)  Mitchell acknowledged that Loco had cocaine and may have intended to sell it.  (Tr. II at 16-17.)  Loco took them to Room 41.  (Tr. I at 134.)  Petitioner answered the door, and Mitchell asked Petitioner if he had a cigarette.  Petitioner said he did not have any, and he gave money to Mitchell to drive to the store for cigarettes, beer and liquor.  (*Id.* at 136-37.)   Mitchell left Loco with Petitioner and Ryan Keller, both of whom he identified in court.  Mitchell testified that Keller was quiet and appeared scared.  (*Id.* at 137.)  When Mitchell returned, he put the items on the table, as directed.  At that time, Keller was sitting at the table.  (*Id.* at 137.)  Mitchell testified that Petitioner seemed upset with Keller, calling him stupid

and complaining about everything he did.  (*Id.* at 138.)  Keller appeared nervous and afraid to say anything and kept looking down.  (*Id.* at 139.)  Petitioner then said that he was going to teach Keller a lesson.  (*Id.*)  Petitioner began hitting Keller in the head and calling him names.  (*Id.* at 140.)  He then ordered Keller to leave the table to make room for Loco, directing Keller to sit on the floor and hitting him a few more times.  Keller sat on the floor with his back to the wall and his knees up.  (*Id.* at 141-42.)  As Petitioner kept hitting him, Keller would say, "Ouch," and, "[t]hat hurt," and he began to cry and ask for his girlfriend.  (*Id.* at 142-43.)  Petitioner then hit Keller more, telling him he would do nothing unless Petitioner told him to.  (*Id.* at 143.)  After Mitchell had witnessed these events, Petitioner came up to Mitchell, grabbed him by the neck to keep him from breathing, and instructed him that, no matter what he saw, he should not say or do anything about it.  (*Id.* at 144.)  Mitchell was afraid of Petitioner and did not want to be subjected to the treatment Keller was receiving.  (*Id.*)  Mitchell looked at Loco for help, but Loco just told him not to worry about it because he was with Loco.  (*Id.* at 144-45.)  Sometime later, Petitioner bought crack cocaine from Loco, and Mitchell and Petitioner smoked it.  (*Id.* at 146-47.)  During this time, Keller stayed on the floor, breathing hard from nervousness.  (*Id.* at 147.)  Mitchell could see Keller, shaking and scared. Petitioner began to pick on Keller again, calling him names and hitting and kicking him.  (*Id.* at 148-49.)  Petitioner accused Keller of coming to Petitioner's room in order to set him up to get kicked out of the hotel.  (*Id.* at 149.)  Petitioner said that Keller "literally [was] going to get fucked" because Keller was trying to "fuck" over Petitioner.  (*Id.* at 150.)  Petitioner then told Keller to drop his pants and bend over.  Mitchell could see a substance that looked like ejaculate running down Keller's leg. (*Id.* at 151.)  Petitioner kept saying he had literally fucked Keller and would probably do it again before he was done with him.  (*Id.* at 152.)  Keller was scared and crying.  (*Id.*)  Mitchell thought

about leaving, but the door was locked and Tupperware canisters and other items were pushed in front of the door. (*Id.* at 152-53.) Petitioner grabbed Mitchell by the throat again and picked up a butcher knife. Petitioner placed the knife against Mitchell's throat and told Mitchell that he did not trust white people and again threatened Mitchell not to say anything. (*Id.* at 154.) After Petitioner let go of Mitchell, he offered Mitchell and Loco a beer. Petitioner made Keller get off the floor and sit on the bed. (*Id.* at 155-56.) Petitioner began to poke Keller in the side with a razor and renewed calling Keller names. Petitioner hit Keller and attempted to kick Keller in the head. He then poked Keller with the razor some more and punched him in the rib cage. Petitioner ordered Keller to sit by the window with his head down. (*Id.* at 156-58.) Keller asked for a cigarette a few times and was hit in the head with Petitioner's shoe. After Keller asked again, Petitioner threw his knife at Keller. (*Id.* at 158-59.) Mitchell did not see the knife land, as he was behind Loco, but he subsequently saw the knife sticking out of Keller's calf. (*Id.* at 159.) Petitioner walked over to Keller and removed the knife, setting it on the table in front of Loco. Loco told Petitioner to put the knife away, as he did not want the blood by him. (*Id.* at 160.) Petitioner then made Keller stick out his tongue so that Petitioner could wipe the knife off on Keller's tongue. (*Id.* at 161.) Keller was bleeding significantly. (*Id.* at 161-62.) Loco eventually took Keller into the bathroom and helped him clean up the blood. (*Id.* at 162.) Loco and Mitchell told Keller to tie the towel tightly around his leg and put his foot up. Keller did not seem able to figure out how to do it. Petitioner subsequently tied it loosely, and Loco eventually helped, too. (*Id.* at 162-63.) Petitioner did not want Keller bleeding on his bed, and told him to get on the floor. (*Id.* at 164.) Petitioner then looked at Mitchell again, saying that he did not like white people and did not care about Mitchell.

He again held the knife against Mitchell, bending Mitchell to the side. Petitioner opened a drawer and showed him a pistol. (*Id.* at 165-66.)

While Keller was sitting against the wall, looking scared, there was a knock at the door. Keller's girlfriend was at the door, asking where Keller was. Petitioner pointed her to Keller. When she saw that he was hurt, she got upset. She walked around Petitioner and left the room. Petitioner followed her. Loco and Mitchell told Keller to leave and then left the room themselves. They headed in the opposite direction as Petitioner and the woman. They reached Mitchell's truck and Mitchell got in. Loco started to get in the passenger side, but Petitioner was coming toward the parking lot, carrying something rolled up in his hands, which Mitchell thought was the knife or the gun. Loco got in and held the door for Petitioner. Petitioner then ordered Mitchell to drive. (*Id.* at 167-69, Tr. II at 20.) Mitchell drove because he was afraid of Petitioner. He started to turn out of the lot onto Michigan Avenue, but Petitioner told him to turn around and head toward the alley. (Tr. I at 170.) As Mitchell drove, a black SUV pulled right behind Mitchell's truck. Petitioner directed Mitchell to turn left. When they did, the SUV remained close on Mitchell's bumper. (*Id.* at 171-72.) Petitioner ordered Mitchell to turn right into a subdivision, and they were again followed. Petitioner told Mitchell to turn around in a driveway. The SUV passed them, and Petitioner ordered Mitchell to follow, in order to teach the SUV driver a lesson about following too closely. (*Id.* at 172.) The SUV led them onto Michigan Avenue, where they were stopped by police and eventually arrested. (*Id.* at 173.)

The prosecution then asked to admit the preliminary examination testimony of Dominic Crawford ("Loco") because he was unavailable for trial. (Tr. II at 28-29.) Defense counsel objected on the grounds that prior defense counsel had conducted no cross-examination. (*Id.* at 29.)

The court heard evidence about the prosecution's due diligence in locating Crawford. (*Id.* at 29-44, 49-52.) The court concluded that the prosecution had demonstrated due diligence and that Crawford's testimony from the preliminary examination could be read into the trial record. (*Id.* at 52.)

The parties stipulated to the admission of the report of Sheryl Torigan of the Michigan State Police Forensic Science Division. Torigan reported that an evidence bag she examined contained 10 Vicodin tablets. She also reported that she conducted DNA testing on a knife blade, finding the blood of Ryan Keller. She also found DNA from Keller on the outside of a condom and DNA from Petitioner on the inside of that condom, together with a mixed sample that may have included Keller. The knife handle was inconclusive for DNA. (*Id.* at 44-47.) In addition, the parties stipulated to the admission of Keller's medical records. (*Id.* at 47.)

Dominic Crawford's preliminary examination testimony was read to the jury. (*Id.* at 54-69.) According to Crawford, Mitchell drove him to the Falcon Inn on October 26, 2006. Crawford went to Room 41 to see his friend, Petitioner. (*Id.* at 54-55.) Petitioner was in the room, as was a young, white man named Ryan. Ryan was smoking a cigarette. (*Id.* at 56.) Mitchell came to the room and left fifteen minutes later to buy beer with money given him by Petitioner. Mitchell returned a half-hour later. (*Id.* at 57.) According to Crawford, everyone was argumentative, but later sat down at the table to talk. Ryan sat on the floor while the others were at the table. Crawford did not see Petitioner do anything aggressive with the knife and never saw blood on the knife. (*Id.* at 58-59.) He later testified that Petitioner threw a knife at Ryan "in a playing way." (*Id.* at 60.) Crawford testified that he did not want to testify. (*Id.* at 61.) Crawford was asked about the written statement he gave to the police:

Q	Do you remember writing, "Mike said, shut the fuck up.  And picked up the knife and threw it and stabbed him in the leg.  And I'm like what the fuck?

He pulled out, (sic), of his leg and grabbed Ryan's head and made him lick blood off the knife.

(*Id.* at 62.)  Crawford identified the statement and testified that it was his handwriting and that he might remember writing it.  (*Id.* at 63.)  Crawford claimed that if it happened, he would have pushed the whole thing out of his memory.  (*Id.* at 64.)  Crawford stated that he remembered going into the bathroom to assist Ryan Keller, getting him some tissue.  Keller was fine.  According to Crawford, any physical contact between Petitioner and Keller was playful punching.  (*Id.* at 65.)  Crawford stated that Petitioner was playing with the knife and accidentally hit Ryan in the leg.  (*Id.* at 67.)  Crawford told Petitioner to let Ryan go, as he would bring nothing but trouble.  (*Id.* at 67-68.)

Dearborn Police Sergeant Krawsczyk testified that he was working undercover on a narcotic investigation in the area of the Falcon Inn.  He requested a traffic stop on a pickup truck that was leaving the Falcon Inn.  (*Id.* at 70-71.)  Krawsczyk identified Petitioner as one of the passengers in the truck.  (*Id.* at 72.)  As soon as Krawsczyk came up to Petitioner, Petitioner asked if the stop was about the kid and the blood inside the room.  (*Id.* at 72.)  Krawsczyk was the officer in charge of the scene.  Following the arrest, the police planned to conduct a search at the motel because the description matched the subjects who had sold narcotics to the police shortly before.  The vehicle also was involved in traffic violations, as it was being driven erratically and speeding.  (*Id.* at 73-74.)

Dearborn Police Officer Jeffrey Garrison was patrolling the area when plain-clothes units requested a traffic stop on a red pickup with one headlight, based on a traffic violation.  (*Id.* at 78-79.)  He made the stop.  The driver was the owner, Mr. Mitchell.  The center passenger was

Petitioner, whom Garrison identified in court. The far-right passenger was Crawford. (*Id.*) Garrison found drug paraphernalia on Mitchell and an open alcohol container on the floor in front of Mitchell. (*Id.* at 79-80.) Garrison personally arrested Mitchell, taking the crack pipe into evidence. (*Id.* at 79.)

Dearborn Police Corporal Jamison Carpenter testified that he also participated in the traffic stop on October 26, 2006. (*Id.* at 86.) He was in a surveillance vehicle and dressed in plain clothes. (*Id.* at 87.) He became involved because the narcotics unit was arranging a controlled buy, and he was going to monitor Corporal Christensen, who was acting undercover. (*Id.* at 87, 98.) At 4:20 p.m., Carpenter observed a 40-year-old black male and a 20-year-old white male exit the west side of the Falcon Inn and walk towards the Burger King. (*Id.* at 100.) The two were subsequently identified as Petitioner and Keller. Carpenter saw Petitioner holding the back part of Keller's tricep and guiding him forward. Keller had his head down during the entire walk. (*Id.* at 101.) Before they went to the Burger King, they stopped at a Fast Track gas station, which Keller entered. Petitioner waited outside. (*Id.*) When Keller came out, Petitioner again clutched Keller's arm and led him toward the Burger King. (*Id.* at 102.) Carpenter identified a gray cell phone that he secured at the scene. (*Id.* at 88.) He did not recall where the phone was from. (*Id.* at 93.) He identified photocopies of money given to the confidential informant, which was compared to $40.00 recovered from Petitioner at the scene. (*Id.* at 93-95.)

Eric Christensen testified that he was a Narcotics Investigator with the City of Dearborn. (*Id.* at 107.) On October 26, 2006, Christensen was the control officer for an undercover drug buy. (*Id.*) He was contacted at about 3:00 p.m. by a confidential informant, who informed him that he was in a position to purchase prescription pills from Petitioner. (*Id.* at 108.) He contacted

the surveillance team and picked up the informant. He recorded the informant's call to Petitioner's cell phone, which was recovered after the arrest and showed the telephone call from the informant. (*Id.* at 108-09, 111, 113.) Before the informant was sent, the officers searched him for weapons, contraband and money. Christensen then gave the informant $70.00, the agreed price of the narcotics. The bills had already been photocopied and recorded at the station. (*Id.* at 110-11.) After the informant went into the Burger King, he returned to tell Christensen that Petitioner wanted to meet him. Christensen and the informant went inside and sat down with Petitioner and Keller. (*Id.* at 114-16.) Keller was visibly shaken, his hands and body trembling. (*Id.* at 116.) Christensen asked, "What's up with [the] boy here?" (*Id.*) Petitioner responded, "Don't worry about him, he's straight." (*Id.*) Keller had placed some ketchup packets next to Petitioner. Petitioner responded, "Get that fucking ketchup away from me. What the fuck is your problem? You already have one violation today for knocking on my door and now you just caught another one. You know what's going to happen to you when you get back to the room; right?" (*Id.* at 117.) Keller became even more nervous, and he never looked up or met the eye of any other person. (*Id.*) The men agreed to complete the transaction in the parking lot of the motel, for ten Vicodin and ten Xanax. (*Id.* at 118.) They all walked out together. (*Id.*) Christensen and the informant got in their vehicle and drove to the hotel. They waited a few minutes, but Christensen became nervous. He had the informant make another call to tell Petitioner to hurry. (*Id.* at 119.) Shortly thereafter, a nervous Keller came out of the Falcon Inn, walked to the passenger window, and dropped the pills into the informant's hand. He made no eye contact. (*Id.* at 120.) The pills included 10 Vicodin and 10 Zanoplex, not Xanax. (*Id.* at 121.)

Shortly after the traffic stop, Christensen and other officers were at the base of the motel stairway, discussing searching Petitioner's hotel room. Keller and a woman, Holly Hidinger, came around the corner. (*Id.* at 128.) Keller appeared frightened and had an obvious injury to his lower right leg, with blood soaked through his pant leg. (*Id.*) The officers notified the Dearborn Fire Department to send a rescue vehicle, telling Keller to sit on the curb. Sergeant Mencotti attempted to take a statement from Keller, but he was not speaking very coherently. (*Id.* at 129.) Christensen and other narcotics and special operations officers executed a search warrant on Petitioner's motel room. (*Id.* at 126, 130.) The room was congested and disordered, and they found numerous types of prescription pills, all of them non-narcotic. (*Id.* at 126, 130, 133-34.) They also found an imitation gun in a dresser drawer and a bottle of lotion on the coffee table. (*Id.* at 131.) They recovered a used condom and bloody towels. (*Id.* at 137.) After interviews with Crawford and Mitchell, officers executed a second search warrant to look for knives. They took two wooden-handled steak knives into evidence. (*Id.* at 138-39.) Christensen confirmed that two $20.00 bills in Petitioner's possession matched the photocopies of the money given to the informant to make the drug purchase. (*Id.* at 141.) Christensen testified that neither Dominic Crawford nor Holly Hidinger were able to be located for trial. (*Id.* at 143-44.)

Dearborn Police Officer Alan Brzys testified that he participated in the execution of the search warrant of Petitioner's motel room. He confiscated bloody towels and a cup containing a used condom, cigarettes and ashes. (Tr. III at 4-7.) Detective Sergeant Gary Marchetti testified that he interviewed Petitioner, after which Petitioner wrote a seven-page statement. (*Id.* at 12-13.) Marchetti read Petitioner's statement into the record. (*Id.* at 14-21.) In the statement, Petitioner stated that Wesley James knocked on his door at 12:15 p.m. James pointed out Keller, Holly's

friend, in the parking lot. After leaving briefly, James came back, telling Petitioner he had information about Petitioner's family. Petitioner became angry and pushed James out the door. Less than a minute later, Keller knocked, asking if Wesley was there. Petitioner told him to check Wesley's room and then asked what Keller wanted. (*Id.* at 14-15.) Keller told him, "Crack/weed." (*Id.* at 15.) Petitioner pushed Keller to Wesley's room, and Wesley admitted telling Keller to go to Petitioner's room to smoke a joint together. Petitioner left both Keller and Wesley at Wesley's door. Shortly thereafter, while a maid was vacuuming his room, Keller came to the door again, and Petitioner told him he could stay until his girl got home. Wesley James came to the door a bit later. Petitioner told Keller to answer the door, and Wesley gave Keller some crack or weed. Keller smoked it in Petitioner's room, angering Petitioner. (*Id.* at 15-16.) Petitioner told him that he could not smoke in Petitioner's room, and Keller grabbed a steak knife. The two struggled. Petitioner had a puncture in the wrist and Keller got stabbed in the leg. Petitioner felt bad about the injury and got towels, peroxide, bleach, alcohol and medical tape to help stop the bleeding, together with a change of clothes. He also offered to call 911. (*Id.* at 16-17.) Petitioner lectured Keller about his drug habits and Keller cried about his life circumstances. After a friend called and asked to meet, Petitioner asked Keller if he was hungry and took him to the Burger King. Petitioner sold his friend, the confidential informant, some pain pills and muscle relaxers. (*Id.* at 17.) Petitioner and Keller walked back to the motel. They stopped at the desk and told the manager that they would be in Petitioner's room and asked the manager to alert them when Holly returned from work. (*Id.* at 17.) The manager angrily told Petitioner that Keller and Holly could not stay; they had to pay. (*Id.*) On the way back to Petitioner's room, they ran into Wesley's girlfriend, Toni. Petitioner told Toni that Keller was going to wait in Petitioner's room until Holly got home. (*Id.* at 18.) Shortly thereafter,

Petitioner and Keller went to get beer, returning at about 4:00 p.m. They watched TV and Keller cried about his personal problems. Petitioner let Keller get high on his drugs until about 6:00 or 7:00 p.m., when Crawford and his friend Keith came. Keller began to become panicky, and Petitioner told him to calm down. (*Id.* at 18-19.) When Crawford noticed a bloody towel on the floor of the bathroom, Petitioner explained that Keller had gotten hurt. Crawford and Keith got nervous and wanted to leave. (*Id.* at 19.) At 7:30 or 8:00 p.m., Petitioner saw Holly arrive and ran downstairs to tell her that Keller was in his room. She went upstairs and saw Keller sitting on the floor. She asked Keller if he had been "smoking that stuff," and he answered, "Yes." (*Id.* at 19-20.) She went back downstairs with Keller and began to check in, sending Petitioner back up for her book bag. She then demanded her money back and left with Keller. Petitioner, Crawford and Keith left the motel to eat. When they noticed they were being followed, they returned to the motel because Petitioner wanted to know what was going on. (*Id.* at 20.) Petitioner's statement was dated October 27, 2009 at 12:15 p.m. (*Id.* at 21.)

According to Officer Brzys, Petitioner then answered a series of written questions with written answers. He denied selling or giving Keller any crack, weed or pills, saying that Wesley gave him the crack. Petitioner stated that Keller got hurt after he grabbed a kitchen knife and the two struggled over it. Petitioner stated that he sold George Allen 10 Vicodin and a couple of muscle relaxers, "Zanex," for $2.00 a pill. (*Id.* at 22.) Petitioner also stated that he had made the statement and answered questions freely and voluntarily, without coercion. He then signed the statement at 12:25 p.m. (*Id.* at 22-23.) Because of inconsistencies in the statement, Brzys continued questioning Petitioner and Petitioner signed a second statement at 1:10 p.m. In his second statement, Petitioner claimed that he had consensual sex with Keller. Petitioner claimed to have used a condom

and penetrated Keller anally for a couple of minutes.  Petitioner denied ejaculating.  (*Id.* at 24-25.)

Again, because of inconsistencies, Brzys wrote additional questions, which Petitioner answered in

writing.  In those answers, Petitioner denied oral sex, but admitted that they had mutually

masturbated.  He stated that Keller had put lotion on his feet and masturbated Petitioner with his

feet.  Petitioner also admitted that he had used a condom and penetrated Keller anally for about two

minutes without ejaculating.  Petitioner then took a shower.  Petitioner again declared that the

statement was voluntary and uncoerced, and he signed it at 1:10 p.m.  (*Id.* at 26-27.)

> Petitioner took a short break and then gave a third statement:

> "Knock on the door.  Dominique and Keith come in.  Keith gave Ryan more crack.  And Dominique asked me what was going on.  Ryan said at the moment that he's been here all day and he could really use a hit.

> Ryan said to the guys that we had sex after smoking crack, and asked me while sitting in his chair in front of me if I would like more masturbating with his feet.  I said, 'Hell, no.'

> It was like a moment of craziness again, and I picked up a small kitchen knife and threw it at Ryan, and cut him.

> Dominique – I, Dominique and Keith all tried to clean up Ryan and get him a bandage or tape his leg.

> When Holly came home shortly after that, she saw him sitting on the floor with his pant leg taped and bloody from a wound I inflicted."

(*Id.* at 29.)  Petitioner then answered more written questions, stating that he had been bothered by

the blood on the floor and knife and that he had wiped the blood off onto Ryan's shirt.  He also went

up to Keith and wiped the knife off on Keith's crack pipe and sleeves and told Keith that he was the

reason the problem had happened, because he had brought the crack.  Petitioner told Keith that he

should have just cut Keith or thrown the knife at Keith.  (*Id.* at 30.)  Petitioner signed the written

answers at 2:05 p.m.

Following Brzys' testimony, the jury left the courtroom. The parties amended the 10-count information to conform with the evidence. (*Id.* at 35-42.) Defense counsel placed on the record a colloquy confirming Petitioner's decisions not to call a defense witness and not to testify. (*Id.* at 42-43.)

At the conclusion of trial, on July 30, 2007, the jury found Petitioner not guilty of two counts, but guilty on the remaining counts, including one count each of kidnapping, CSC II, CSC III, assault with intent to commit great bodily harm less than murder, and assault and battery. (Tr. IV, 33-34.) On August 15, 2007, Petitioner was sentenced to three prison terms of 10 to 15 years for the CSC II, CSC III and kidnapping convictions and a term of 6 to 10 years for the assault-with-intent conviction. The court dismissed the assault-and-battery conviction. (Sentencing Transcript, (S. Tr.) at 9, docket #21.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on May 20, 2008, raised the same two issues presented in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #22.) Petitioner filed a motion to remand, which was denied by the Michigan Court of Appeals on July 10, 2008. (See 7/10/08 Mich. Ct. App. Ord, docket #22.) By unpublished opinion issued on November 20, 2008, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 11/20/08 Mich. Ct. App. Opinion (MCOA Op.), docket #22.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same two claims presented to and rejected by the Michigan Court of Appeals. By order entered December 9, 2010, the Michigan Supreme Court denied his application

for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* 12/9/10 Mich. Ord., docket #27.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

I.      Ineffective Assistance of Counsel

In his first ground for habeas relief, Petitioner contends that his trial attorney rendered ineffective assistance of counsel by failing to obtain records regarding the complainant's mental health and by failing to secure a psychological expert for trial.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The Michigan Court of Appeals addressed the issue as follows:

> Defendant first argues that he received ineffective assistance of counsel because his attorney allegedly failed to obtain complainant's mental health records and failed to get a psychological expert to impeach complainant's testimony. Complainant acknowledged that he had not taken his medications for at least three days before the crime. Defendant asserts that an expert would have discredited complainant by addressing the effects of this action and by establishing that the complainant's disorganized and inconsistent recollection of the events was indicative of his mental illness. He asserts that the CSC and kidnapping charges were based on complainant's perception of events, and that his perception mattered since defendant claimed that complainant consented to sex and was not being held against his will. We disagree.

Our review is limited to the existing record. *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005). To succeed on this claim, defendant must show that trial counsel's performance fell below an objective standard of reasonableness and that, but for the errors, there would have been a reasonable probability of a different outcome. *People v Rice* (On Remand), 235 Mich App 429, 444; 597 NW2d 843 (1999). Defendant must overcome the presumption that his counsel's assistance was based on sound trial strategy. *Id.*

The existing record does not support the supposition that a psychological expert or an in-depth examination of the mental health records would have been helpful to defendant's case. It was established that complainant was schizophrenic and had not taken his medications but had smoked marijuana for three days, and had smoked marijuana laced with crack cocaine on the day in question. Complainant admitted that without his medications he had auditory hallucinations and did not sleep. There is nothing to suggest that more authoritative impeachment by an expert would have been of significant value. Moreover, counsel could have determined that the impeachment value of the existing evidence was sufficiently solid, and that calling an expert could have compromised its value. Defendant has not overcome the presumption that counsel had a sound trial strategy. *Rice*, *supra*.

(MCOA Op. at 1-2.)

Although the Michigan Court of Appeals did not mention *Strickland*, it relied on Michigan case law that applied the *Strickland* standard. *See Rice*, 597 N.W.2d at 852 (citing *People v. Pickens*, 521 N.W.2d 797, 309 (citing *Strickland*)). When a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *see also Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Richter*, 131 S. Ct. at 786).

Petitioner fails to overcome the double deference owed to the court of appeals' determination. As the court of appeals observed, trial counsel extensively cross-examined Petitioner concerning his psychiatric conditions. Keller admitted that he had been diagnosed as schizophrenic and that he was prescribed medications for that condition. (Tr. I at 79.) Before the date of the criminal conduct, he had walked away from his group home and not taken his medications for about three days. (*Id.* at 81, 113-14.) He admitted that, when he failed to take his medication, he did not sleep for days on end and had auditory hallucinations. (*Id.* at 127-28.) Keller also admitted smoking marijuana and crack cocaine on the day in question. (*Id.* at 82, 120.) He admitted that his memory is bad and that he did not know which medications he was prescribed. (*Id.* at 98, 111, 114.) And Keller admitted lying about whether he had taken his medication on the day of trial. (*Id.* at 111-12.)

As the court of appeals observed, it is highly doubtful that the addition of expert testimony would have further impeached Keller's testimony, though it ran the risk of undermining the existing impeachment evidence. A reasonable attorney could have concluded that, as a matter of trial strategy, it was better not to call a psychiatric expert. Petitioner therefore fails to overcome the presumption that counsel met the performance prong of the *Strickland* standard. On these facts, the court of appeals' decision unquestionably constituted a reasonable application of clearly established Supreme Court precedent.[2]

---

[2]Although the court of appeals did not reach the question of prejudice, because Keller was thoroughly impeached regarding his mental health issues and limitations, Petitioner also cannot demonstrate that the failure to call an expert had a reasonable probability of affecting the outcome. He therefore fails to meet the prejudice prong of *Strickland*. *See Strickland*, 466 U.S. at 694 (defining prejudice).

II.    <u>Prosecutorial Misconduct</u>

In his second ground for habeas relief, Petitioner argues that the prosecutor committed misconduct during closing arguments. Specifically, Petitioner argues that the prosecutor repeatedly referred to evidence outside of the record to bolster the complainant and improperly appealed to the jury to sympathize with the victim.

The Michigan Court of Appeals concluded that Petitioner had failed to lodge a timely objection to the prosecutor's conduct, and it therefore only reviewed the claim for plain error:

> Defendant next argues that the prosecutor improperly referred to evidence outside the record to bolster complainant's credibility and also improperly appealed to the jury to sympathize with complainant. We find no merit in this argument[.]

> Our review is for outcome-determinative plain error unless defendant contemporaneously and specifically objected, such that a curative instruction could have been given, unless the error could not have been cured. *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003). If not preserved, reversal is warranted only when plain error resulted in the conviction of an innocent person, or seriously affected the fairness, integrity, or public reputation of the proceedings. *People v Unger*, 278 Mich App 210, 235; 749 NW 2d 272 (2008).

> A prosecutor may not make a statement of fact to the jury that is unsupported by the evidence. *Id.* The prosecutor argued that complainant was terrified when he did not flee, that people don't know what they would do in such a situation, and that "[y]ou don't know psychologically what is happening inside another person." In this context, the prosecutor referenced well-known cases in which captives stayed with their captors for extended periods despite having chances to flee. Defendant asserts that the prosecutor was describing the "Stockholm Syndrome" even though the syndrome had not been introduced into evidence by any expert. However, in context, the prosecutor was arguing that captives do not always run when given the opportunity; she was not arguing that the "Stockholm Syndrome" applied to defendant. To the extent there was ambiguity, a curative instruction could have offered clarification. There was no objection or request for such an instruction and accordingly, review is for outcome-determinative plain error. Two witnesses, including defendant's friend, substantiated complainant's testimony that he was being held against his will. It appears that a recorded telephone conversation between a police informant and defendant also buttressed complainant's claims. Under these circumstances, defendant has not shown any reasonable probability of a different outcome.

Defendant also argues that the prosecutor impermissibly told the jury, without basis in expert testimony, that consistent testimony from the mentally ill complainant would require hours and "pinpoint" questioning. However, this remark was a reasonable inference based on inconsistencies in complainant's testimony and his mental illness, and therefore did not constitute prosecutorial misconduct. See *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). Defendant argues that the prosecutor also interjected as fact arguments that rape is about power and control, and that the behavior of building someone up and then breaking him down is consistent with sociopathic behavior. The prosecutor pointed to supporting evidence, and made these comments in the context of arguing that the evidence did not support a finding of consent. There was no objection or request for a curative instruction, and defendant must therefore establish plain error. There is no reasonable probability that the jury would have reached a different conclusion on consent given the testimony of the other witnesses and the tape.

Defendant next argues that the prosecutor, without reference to evidence, pointed out that the size of defendant's penis and complainant's anus were unknown in an effort to explain the absence of anal injury. In closing argument, defense counsel suggested that the absence of anal tearing supported a finding of consent. This argument was not misconduct; it was responsive to a matter raised by defendant and proportionate in its response. See *People v Jones*, 468 Mich 345, 353; 662 NW2d 376 (2003).

Next, defendant asserts that the prosecutor made civic duty arguments, which are prohibited. See *Bahoda*, supra at 282-283. Defendant notes the prosecutor's remark intimating that she knew a jury would not convict based on complainant's testimony alone given his mental health. She was acknowledging inconsistencies in complainant's statements, and expressed thanks that the police had garnered so much corroborating evidence. In essence, the prosecutor was admitting that complainant, because of his mental illness, had credibility issues, but was asserting that the corroborating evidence supported a finding that he was credible. Credibility was an issue in the case and was not an issue that was "broader than guilt or innocence." *Id.* at 284.

The prosecutor subsequently asked the jury to consider all the evidence and, in essence, asked the jury to give complainant justice. We conclude that the prosecutor was, in essence, arguing that the evidence supported a finding of guilt and a determination that the jury should find complainant credible. However, even if this comment were interpreted as a request to sympathize with a vulnerable victim, we conclude that any error would be harmless. MCR 2.613(A); *People v Mateo*, 453 Mich 203, 210, 212; 551 NW2d 891 (1996). For the reasons previously discussed, we conclude that this comment would not have affected the outcome of the proceedings.

(MCOA Op. at 2-3.)

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence,

it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.[3] It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002).

In addition, Petitioner does not seriously dispute that he failed to lodge a contemporaneous objection to each of the alleged errors addressed by the state court. He asserts only that, after the conclusion of closing arguments, defense counsel sought a mistrial, contending that the prosecutor had improperly made appeal to civic duty:

> Prosecutor "started telling the Jury how appalled she is when they have handicapped [complainants] because they can never get justice. . . . I think that's unnecessarily inflammatory. I think it's appealing to biases and prejudices of the Jury, to try and get them to decide this case based on how handicapped people are treated in the system.

(Tr. III at 87.) Counsel, however, moved only for a mistrial. When her motion for mistrial was denied, she did not seek a corrective instruction. The belated request for a mistrial, therefore, does not constitute a timely request for a curative instruction. Moreover, it is undisputed that Petitioner lodged no contemporaneous objection to the remainder of the alleged prosecutorial improprieties,

---

[3]Further, where, as here, a state court has invoked the procedural rule, the mere fact that the court subsequently reviews a a petitioner's claim for plain error "does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice").

such as the prosecutor's alleged bolstering of the complainant by her alleged reference to "Stockholm Syndrome" and other facts outside the record. In sum, Petitioner clearly failed to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, which caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011; *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485.

Petitioner has not shown cause excusing his failure to object. Therefore, prejudice need not be considered. *See Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup*, 513 U.S. at 322 (citing *Murray*, 477 U.S. at 495). This requires a showing "that 'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Coleman*, 244 F.3d at 540 (quoting *Schlup*, 513 U.S. at 329). Accordingly, I conclude that Petitioner's prosecutorial misconduct claim is procedurally defaulted.

Finally, even were it not defaulted, Petitioner's prosecutorial-misconduct claim is without merit. In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643

(1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

        As fully discussed by the Michigan Court of Appeals, the prosecutor's closing remarks were substantially proper comments based on the evidence and reasonable inferences from that evidence. Given the significant corroborating evidence in the case, the content of Petitioner's own statements, and the absence of timely objections, any impropriety in the prosecutor's remarks did not render the trial fundamentally unfair. *Darden*, 477 U.S. at 181. The court of appeals'

determination of the prosecutorial-misconduct claim therefore was based on a reasonable application of established Supreme Court precedent.

## **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:  September 3, 2013                    /s/ Hugh W. Brenneman, Jr.
                                             HUGH W. BRENNEMAN, JR.
                                             United States Magistrate Judge


## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).